1  TROUTMAN SANDERS LLP
   Louise M. McCabe (*pro hac vice*)
2  louise.mccabe@troutmansanders.com
   Timothy P. Irving (*pro hac vice*)
3  tim.irving@troutmansanders.com
   Louis M. Segreti (*pro hac vice*)
4  lou.segreti@troutmansanders.com
   11682 El Camino Real, Suite 400
5  San Diego, California 92130-2092
   Telephone:    (858) 509-6000
6  Facsimile:    (858) 509-6040

7  LAW OFFICES OF ROBERT S. MURPHY, LLC
   Robert S. Murphy (Arizona Bar No. 013620)
8  bob@rmurphylaw.com
   1650 North First Avenue
9  Phoenix, Arizona 85003
   Telephone:    (602) 528-4728
10 Facsimile:    (866) 224-2188

11 Attorneys for Allstate Insurance Company

12                IN THE UNITED STATES DISTRICT COURT

13                    FOR THE DISTRICT OF ARIZONA

14 Nammo Talley, Inc.,                    | Case No. CV 11-01007-PHX-SMM

15              Plaintiff,                 | **UNDER SEAL**

16      v.                                | **DEFENDANT ALLSTATE
                                           | INSURANCE COMPANY'S
17 Allstate Insurance Company, et al.     | MOTION FOR SUMMARY
                                           | JUDGMENT ON LATE NOTICE
18              Defendants.                | AND NAMED INSURED ISSUES**

19                                         | **Oral Argument Requested**

20                                         | **Assigned to: Hon. Stephen M.
21                                         | McNamee**

22

23         Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Allstate

24 Insurance Company, solely as successor-in-interest to Northbrook Excess and Surplus

25 Insurance Company, formerly known as Northbrook Insurance Company ("Allstate"),

26 hereby moves for summary judgment on Plaintiff's claims for coverage under

27 Northbrook Umbrella Liability Policies 63-300-109 and 63-002-569 (the "Northbrook

28 Policies"), on the following grounds:

1.      Allstate is entitled to summary judgment because Plaintiff failed to comply with the "Notice of Occurrence" condition in the Northbrook Policies by waiting 17 years after entering into a consent judgment in which it accepted liability for environmental contamination resulting from its long-term, routine business practice of dumping contaminants into unlined pits, and 30 years after the last Northbrook policy expired, to notify Allstate of the contamination, resulting in substantial prejudice to Allstate.

2.      Allstate is entitled to summary judgment because Plaintiff cannot meet its burden of proving that it is a named insured or an additional insured under the Northbrook policies.

3.      This Motion is supported by the Memorandum of Law that follows, the contemporaneously-filed Separate Statement of Material Facts ("SSOF"), and the declaration and exhibits submitted herewith.

## MEMORANDUM OF LAW

## I.      INTRODUCTION

In October 2008, Plaintiff Nammo Talley, Inc. ("Plaintiff" or "Talley") notified Allstate for the first time of claims brought against it 17 years earlier by the State of Arizona for environmental contamination at Plaintiff's 550-acre manufacturing facility in Mesa, Arizona (the "Site"). While Allstate was investigating Plaintiff's claim under a full reservation of rights, Plaintiff brought this lawsuit against Allstate and other insurers seeking insurance coverage for alleged past and future environmental cleanup costs.

According to Plaintiff, its routine waste disposal practices over several decades have resulted in soil and groundwater contamination at the Site and neighboring properties. These operations involved primarily two areas of operation – the water bore-out ("WBO") area where solid propellant containing ammonium perchlorate was removed from aged rocket motors by a pressurized water stream and discharged into unlined pits, and the thermal treatment unit ("TTU"), or "burn ground," where propellant waste, lead and other materials were openly burned for many years on bare soil. The WBO was in

1   operation from at least 1973 (and possibly as early as the mid-1960s) until October 1990,

2   while the burn ground operated for roughly 40 years from 1966 until 2006.

3          In its Motion for Summary Judgment on the Pollution Exclusion filed on March

4   21, 2014, Allstate demonstrated that coverage is barred by the "sudden and accidental"

5   pollution exclusion in the Northbrook Policies because the current soil and groundwater

6   contamination arose entirely from the routine discharge of pollutants at the WBO and

7   TTU areas, and *not* from any temporally abrupt or accidental polluting event. (*See* Doc.

8   131.)[1] The present Motion addresses two additional, independent reasons for granting

9   summary judgment.

10         *First*, Plaintiff has failed to comply with a condition precedent to coverage:

11  timely notice of the alleged occurrence. Plaintiff was required to provide notice to

12  Allstate "as soon as practicable" after it became reasonably apparent that its claimed past

13  and future remediation costs were likely to involve the Northbrook Policies. Plaintiff

14  realized by the early 1990s that its potential liability under the Consent Judgment it

15  entered into in September 1991 was likely to exceed $1 million. Nonetheless, Plaintiff

16  waited until **October 2008** to give notice to Allstate, even though it had notified its

17  primary insurers of the claim two years earlier. During the intervening years, essential

18  company records from the relevant time period have been lost or destroyed,

19  eyewitnesses have died or are otherwise unavailable to testify, and the physical features

20  of the Site have been altered in the areas where the discharges of contaminants occurred.

21         *Second*, it is Plaintiff's burden to establish that its claim falls within the policy's

22  insuring agreement, and therefore it must prove that it is an "insured" under the

23  Northbrook Policies. Plaintiff cannot meet this burden. Nammo Talley, Inc. is neither

24  the named insured nor an additional insured under the 1975-1978 Northbrook Policies,

25  and Plaintiff has failed to produce evidence that it has any rights under the policies as

26  either a corporate successor or a valid assignee.

27

28

[1] Allstate's earlier pollution exclusion motion is case-dispositive.  If that motion is granted, it will eliminate the need for the Court to consider this Motion.

TROUTMAN SANDERS LLP
11682 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2092

1    For these reasons, the Court should grant Allstate's Motion in its entirety.

2    **II.    ARGUMENT**

3        **A.    Summary Judgment Standard**

4        A court must grant summary judgment if the pleadings and supporting documents,

5    viewed in the light most favorable to the nonmoving party, "show[] that there is no

6    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

7    of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.

8    Ct. 2548, 91 L. Ed. 2d 265 (1986). "Only disputes over facts that might affect the outcome

9    of the suit under the governing law will properly preclude the entry of summary

10   judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.

11   2d 202. The dispute must also be genuine, that is, the evidence must be "such that a

12   reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party

13   need not disprove matters on which the opponent has the burden of proof at trial. *See Id.*,

14   at 323-24. However, the party opposing summary judgment must set out specific facts

15   showing a genuine dispute for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

16   *Corp.*, 475 U.S. 574, 585-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

17       **B.    The Policies**

18       Plaintiff is seeking coverage under two Northbrook Umbrella Liability Policies

19   issued to Talley Industries, Inc. (*See* Complaint (Doc. 1) at ¶¶ 35-38.) The Northbrook

20   Policies were in effect for only three years out of the 54 years that the Site has been in

21   operation: Policy No. 63-300-019 was in effect from January 1, 1975 to January 1, 1977,

22   and Policy No. 63-002-569 was in effect from January 1, 1977 to January 1, 1978.

23   (SSOF ¶ 1.) Both policies contain the following notice requirement:

24       *VII. NOTICE OF OCCURRENCE*

25       *Whenever the Insured has information from which the Insured may*
     *reasonably conclude that an Occurrence covered hereunder*
26   *involves injuries or damages which, in the event that the Insured*
     *should be held liable, is likely to involve this policy, notice shall be*
27   *sent to the Company at its Home Office as soon as practicable,*
     *provided, however, that failure to give notice of any Occurrence*
28   *which at the time of the Occurrence did not appear to involve this*

> *policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim.*

(SSOF ¶ 5.)

The Northbrook Policies are umbrella policies that do not have an obligation to respond, if at all, until and unless the underlying insurance is exhausted or inapplicable. Section II ("Limit of Liability") in the Policies provides, in relevant part:

> *The Company shall only be liable for the Ultimate Net Loss in excess of either*
>
> *A.      the limits of the underlying insurances as set out in the attached SCHEDULE OF UNDERLYING POLICIES in respect of each OCCURRENCE covered by said underlying insurances, or*
>
> *B.      the retained limit as stated in Declaration Item 2(c) if the Occurrence is not covered by said underlying insurance (hereinafter called the underlying limits) . . .*

(SSOF ¶ 6.)  According to Schedule(s) of Underlying Policies, Policy 63-300-019 is excess of $500,000 in underlying general liability insurance or a $25,000 per occurrence retention, and Policy 63-002-569 is excess of $500,000 in excess liability and underlying general liability insurance. (*Id.* ¶¶ 8-9.)

The interpretation of an insurance contract is an issue of law for the court to decide. *Thomas v. Liberty Mut. Ins. Co.*, 173 Ariz. 322, 842 P.2d 1335, 1337 (Ct. App. 1992); *McHugh v. United States Auto Ass'n.*, 164 F.3d 451 (9th Cir. 1999). For purposes of this Motion, the parties agree that Arizona substantive law governs. Under Arizona law, insurance contract provisions should be construed according to their plain and ordinary meaning. *Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 193 Ariz. 581, 584, 975 P.2d 711, 714 (Ct. App. 1999).

## C.      PLAINTIFF FAILED TO PROVIDE TIMELY NOTICE OF THE CLAIMS FOR WHICH IT SEEKS COVERAGE, AS REQUIRED BY THE NORTHBROOK POLICIES, AND ALLSTATE HAS BEEN PREJUDICED AS A RESULT.

### 1.      After Entering into the Consent Judgment in 1991, Plaintiff Waited 17 Years to Notify Allstate of its Environmental Liabilities Arising from that Judgment.

On October 1, 1990, the State of Arizona filed a civil enforcement action against Plaintiff, seeking injunctive relief and civil penalties for alleged violations of environmental regulations at the Site. (SSOF ¶¶ 25-27.) By September 6, 1991, Plaintiff – without Allstate's knowledge or consent – entered into a written Consent Judgment to resolve the lawsuit. (*Id.* ¶¶ 28, 31-33.) Under this judgment, Plaintiff was required to admit its violation of Arizona's hazardous waste rules, and became legally obligated to perform future site closure and remediation activities of undefined scope, cost and duration. (*Id.* ¶ 29.) The Consent Judgment also required Plaintiff to pay a record environmental fine of $500,000 to the State. (*Id.*) Plaintiff admits that the investigation and remediation costs it has incurred since 1991, as well as the estimated future costs it alleges, are directly attributable to its compliance with the 1991 Consent Judgment. (*Id.* ¶ 30.)

In January 1993, Talley Defense System's senior management set a $1,000,000 budget reserve for site assessment and remediation programs at the WBO and TTU areas, noting the "wide potential ramification" of the various tasks the company was obligated to perform. (SSOF ¶¶ 38-39.) Plaintiff's Chief Financial Officer, testifying as its corporate designee under Rule 30(b)(6), characterized this reserve as "*extraordinary*." (*Id.* ¶ 40.) Yet, if anything, the $1 million estimate was conservative: it did not provide any allowance for groundwater monitoring, even though Plaintiff speculated at the time that perchlorate from the WBO operation had migrated to the groundwater. (*Id.* ¶ 41.)

Plaintiff has argued to this Court that the Northbrook umbrella policies are implicated as soon as the limits of the underlying primary policies are exhausted.[2] (*See* SSOF ¶ 10.) According to Plaintiff, Northbrook Policy 63-300-019 is excess to a $500,000 general liability insurance policy issued by Great American Insurance Company for the period January 1, 1975 to January 1, 1976. (*Id.* ¶ 8.) In December

---

[2] In fact, Plaintiff has taken the position that the underlying insurer's limits can be exhausted even without that insurer paying a cent, provided the insured either pays the limits itself or gives the excess insurer "credit" for them before seeking benefits under the excess policy. (SSOF ¶ 102.)

1  1998, ten years before notice was given to Allstate, Talley Industries entered into a

2  settlement agreement with Great American to resolve unrelated claims. (*Id.* ¶¶ 43-44.)

3  Under the terms of that agreement, Great American paid $457,167 which purportedly

4  represented "*the balance in full of its policy limit*." (SSOF ¶ 45.) If, as Plaintiff asserts,

5  the underlying limits were in fact properly exhausted in December 1998, Allstate should

6  have been notified *at that time* of any alleged occurrence during its policy period, since

7  the claim would be "likely to involve" the Northbrook umbrella policy.[3]

8          Plaintiff also now apparently contends that when environmental property damage

9  occurs over successive policy years, the insured is not required to allocate the loss

10  "horizontally" and exhaust all applicable primary policies first, but may instead choose

11  to allocate the entire loss to a particular policy year and pursue coverage "vertically."[4]

12  (*See* SSOF ¶ 11.) If Plaintiff believes its own allocation argument, it should have placed

13  Allstate on notice as soon as it had information from which it could reasonably conclude

14  that its environmental cleanup costs were likely to exceed the limits of the underlying

15  policy. Plaintiff had this information no later than January 1993, when it established the

16  $1 million reserve. (*See* SSOF ¶¶ 34, 38-41.)

17          The Northbrook Policies require that Plaintiff provide notice to Allstate "*as soon*

18  *as practicable*" once Plaintiff has information from which it may reasonably conclude that

19  its injuries or damages are likely to involve the policies. (*See* SSOF ¶ 5.) Inexplicably,

20

21

22  [3] In addition, after filing its Complaint in this action, Plaintiff reached early settlements
    with the three primary insurer-defendants, who had been given notice two years before
23  Allstate: Royal & Sun Alliance (Globe), Continental and Transportation Insurance
    Companies (CNA), and National Union (AIG).  Plaintiff refused to disclose the terms,
24  amounts, or even the *dates* of those settlements to Allstate, claiming that the settlements
    were both confidential and irrelevant.  (SSOF ¶¶ 46, 104.)  Allstate believes those
25  settlements are relevant to the question of whether Plaintiff has been fully compensated,
    or even *over*compensated, for its alleged expenses to date.  *See Geyer v. Reserve Ins.*
26  *Co.*, 447 P.2d 556, 559 (Ct. App. 1968) ("double recovery or windfall to the insured
    under separate coverages in excess of her actual legal damages" is not permitted).
27
    [4]Allstate disagrees with the so-called "all sums" allocation approach advocated by
28  Plaintiff, and this issue is likely to be addressed by the parties in the third round of
    summary judgment motions.

Plaintiff waited until August **2006** to tender a claim to its primary insurers,[5] and then waited another two years -- until October **2008** -- to notify Allstate. (*Id.* ¶¶ 46-47, 49, 89.) Plaintiff's former CFO Hassan Mirza, the company officer responsible for insurance claims, had a difficult time attempting to explain these delays in his deposition:

> Q.  And you subsequently learned that Allstate had not been put on notice at this time in 2006?
>
> **A.  Right.**
>
> Q.  Do you think that was a mistake?
>
> **A.  I didn't think it was a mistake. I don't know.**
>
> Q.  Do you think it's a mistake now?
>
> **A.  No.**
>
> Q.  Do you think Allstate was entitled to know as soon as possible whether there was a claim that might be made under its policy that could impact its policy?
>
> **A.  I didn't know.**
>
> Q.  Can you think of any reason why Allstate should not have been put on notice of a potential claim earlier than 2008?
>
> **A.  No, I'd just be guessing. I don't know for sure.**

(*Id.* ¶ 92.) Given the "extraordinary" expense that Talley said it was facing in the early 1990s, there can be no justification for waiting 17 years to make an insurance claim. It is possible, of course, that Talley simply did not expect its *general liability* insurers to cover environmental contamination caused by its routine disposal of contaminants over the course of several decades. Tellingly, as late as December 2004 Talley was attempting to add "pre-existing conditions" coverage to its *pollution* liability policy then in effect with Indian Harbor Insurance Company. (SSOF ¶ 42.) In any event, regardless of the reason, the delay cannot be justified, and Allstate has been substantially prejudiced for the reasons discussed in the next section.

---

[5]  Attached to Plaintiff's 2006 tender letter was a cost estimate for ammonium perchlorate remediation that listed over $6,000,000 in recurring and non-recurring costs for soil and groundwater remediation.  (SSOF ¶ 90.)

2.   **Plaintiff's 17-Year Delay Has Substantially Prejudiced Allstate**.

Plaintiff's inordinate delay has prejudiced Allstate's ability to investigate this claim in several material respects. Specifically: (a) virtually no contemporaneous company records from relevant time period relating to the WBO and TTU operations still exist, and records that would reveal the quantities and dates of the relevant discharges have been lost or destroyed; (b) two of the most important percipient witnesses in this case are no longer available, one having died in 2012 and the other now suffering from dementia; and (c) the former WBO operations area and TTU have undergone significant physical alterations since those operations ceased, resulting in the destruction of physical evidence and making any meaningful Site investigation impossible.

The longer the delay between an occurrence and *notice* of the occurrence to an insurer, the greater the chance that evidence will be destroyed or lost, that potential witnesses will disappear or that their memories will fade. *See 4 New Appleman on Insurance Law* § 24.03[1]. In this case, a 17-year delay is prejudicial as a matter of law, as numerous cases make clear. *See E. Prods. Corp. v. Cont'l Cas. Co.,* 787 N.E.2d 1089, 1095 (2003) (holding that death of witness and destruction of records "constituted prejudice to [the insurer] as a matter of law"); *Fireman's Fund Ins. Co. v. ACC Chem. Co.,* 538 N.W.2d 259, 266 (Iowa 1995) (stating that multiple federal cases have found prejudice as a matter of law in cases involving insurance claims for pollution); *Olin Corp. v. Ins. Co. of N.A.,* 771 F. Supp. 76, 79 (S.D.N.Y. 1991), *aff'd,* 972 F.2d 1328 (2d Cir. 1992) (holding that insurer was prejudiced as a matter of law by insured's expenditure of $2 million in remediation costs, entry into a consent decree obligating it to spend millions of dollars more, and changes to the site's physical appearance); *In re Tex. E. Transmissions Ins. Coverage Litig.,* 15 F.3d 1249, 1254-56 (3d Cir. 1994) (holding that inability to inspect site prejudiced insurance company, which received notice eight months after the occurrence); *West Bay Exploration Co. v. AIG Specialty Agencies,* 915 F.2d 1030, 1037 (6th Cir. 1990) (finding prejudice as a matter of law in insured's destruction of waste barrels prior to giving notice); *Port Servs. Co. v. Gen. Ins.*

1    *Co.*, 838 F. Supp. 1402, 1404 (D. Or. 1993) (removal of underground storage tanks held

2    prejudicial as a matter of law); *Hoppy's Oil Serv., Inc. v. Ins. Co. of NA.*, 783 F. Supp.

3    1505, 1509-11 (D. Mass.) (insurer prejudiced as a matter of law when underground

4    storage tank site was remediated before insurer could conduct its own tests, although

5    others had conducted tests before remediation); *Fireman's Fund Ins. Co. v. Valley*

6    *Manuf. Prods. Co.*, 765 F. Supp. 1121, 1129 (D. Mass. 1991), aff'd 960 F.2d 143 (1st

7    Cir. 1992) (finding prejudice as a matter of law where insurer had actual knowledge of

8    tank leaking contaminant and stating "if thirteen years does not constitute unreasonable

9    notice and prejudicial delay in the circumstances of this case, then the concept of late

10   notice is without meaning").)

11       a.    During the 17-Year Delay, Plaintiff Has Lost or Destroyed
        Critical Records that Show the Timing and Amount of

12       Contamination at the WBO and TTU**.**

13   By October 1993, virtually every document relevant to Talley's waste disposal

14   operations prior to 1985 had been lost, discarded or destroyed. (SSOF ¶ 53 [Science

15   Applications Int'l Corp. draft questionnaire report dated October 6, 1993, noting that in

16   general, SAIC's review of Talley's files "*revealed no information pertaining to the TDS*

17   *plants between years 1965 and 1985*"].)

18   Significantly, during the 17-year delay Talley apparently lost or destroyed the

19   only known records evidencing the quantity of propellant waste discharged into the

20   WBO ponds and the dates of disposal. This evidence is directly relevant to Allstate's

21   affirmative defenses that there was no "occurrence" within the meaning of the

22   Northbrook Policies and no "property damage" during the policy periods, and is also

23   relevant to allocation of liability. (*See* Answer (Doc. 22) at 13-14.)

24   Ruben Garcia, a 40-year Talley employee who supervised operations at Plant 3

25   and the adjacent WBO facility, testified that the only documents evidencing the quantity

26   of waste propellant discharged into the WBO pits were the "work orders" he received for

27   the rocket motors processed at the facility. (SSOF ¶ 57-60.) These work orders were

28   maintained in the manufacturing office at Plant 3 *and they still existed when Mr. Garcia*

TROUTMAN SANDERS LLP
11682 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2092

10

1    *retired in 1999*. (*Id.* ¶ 61-62.) Thus, these critical documents were in existence at a time

2    when Allstate should have already had notice of the contamination from the WBO

3    operation. The documents would have provided a reliable basis for determining the

4    volume of perchlorate waste discharged into the WBO pits and the dates of those

5    discharges, information that is clearly relevant to a number of coverage issues in this

6    case. (*See id.* ¶¶ 58-60.) Unfortunately, as these records were never produced in

7    discovery, it must be assumed that they were lost or destroyed *after 1999*. (*Id.* ¶ 63.)

8    Without these records, the quantity of contaminants that Plaintiff discharged into the

9    unlined WBO pits and the dates of those discharges are, at best, matters of speculation.[6]

10          G. Scott Kerr, Talley's former industrial hygienist and Safety Manager, testified

11   that the TTU "burn crew" prepared daily reports that identified the contaminants that were

12   transported to and burned at the burn ground. (SSOF ¶¶ 65-69.) Talley began generating

13   these reports before Mr. Kerr was hired in 1988. (*Id.* ¶ 70.) Mr. Kerr began supervising the

14   burn crews in the early 1990s and changed the format of the burn reports to capture more

15   detail. (*Id.* ¶¶ 69-71.) The burn crews continued preparing these reports "for quite some

16   time." (*Id.* ¶ 70.) The burn reports were ultimately destroyed, and thus were never

17   produced to Allstate. (*See id.* ¶¶ 73-74.) According to Mr. Kerr, these documents were

18   "purged" to prevent "a mountain of files" from accumulating. (*Id.* ¶ 72.)

19          The loss or destruction of these material records, which occurred *after* Allstate

20   should have been put on notice, is highly prejudicial to Allstate. *See Rohm & Haas Co. v.*

21   *Cont'l Cas. Co.*, 781 A.2d 1172, 1180-1181 (Pa. 2001) (acknowledging that loss or

22   destruction of relevant documents is factor in determining whether insurer was

23   prejudiced); *Union Pac. R.R. v. Certain Underwriters at Lloyd's London*, 771 N.W.2d

24   611, 620-621 (S.D. 2009) ("discarding pertinent information relating to a site that had

---

[6] Plaintiff has asserted that between 110,000 gallon and 410,000 gallons of WBO waste
effluent was discharged into the unlined WBO pits, but it has cited no admissible
evidence to support this estimate. Plaintiff's former CFO did not know the volumes of
waste that were processed at the WBO facility in the 1960s and 1970s or even which of
Plaintiff's employees would have that information. (SSOF ¶ 103.  *See also id.* ¶¶ 52, 64,
78-80.)

potential for environmental liability is at least potentially prejudicial to the insurance company"). Plaintiff's failure to preserve this evidence is not surprising, given its casual attitude toward record-keeping. Its 30(b)(6) witness on document retention issues, former CFO Hassan Mirza, testified that *the company has no written document retention policy*. (SSOF ¶¶ 50-51.) Thus, virtually every record relevant to Talley's waste disposal operations prior to 1985 has been lost, discarded, or destroyed. (*Id.* ¶ 53.) Nor, apparently, has the company instituted protocols to preserve relevant electronic evidence. For example, Talley has been using email at its Mesa facility since the early 1990s, but has never had a written document retention policy for email. (*Id.* ¶¶ 55-56.) Instead, its employees apparently have full discretion to purge business email communications. (*Id.*)

Finally, it appears that insurance policies that might be a source of potential contribution have been lost or destroyed. Since at least 1999, Talley has had no written document retention policies that apply to insurance policies. (SSOF ¶ 76.) Although Talley's former insurance consultant, Chuck Lorenz, prepared a list of potentially relevant policies at one time, Talley admits that several of those policies are "missing." (*See id.* ¶¶ 75, 77.)

        b.     In Recent Years, Witnesses Critical to Allstate's Defense Have Become Permanently Unavailable**.**

The main focus of discovery in this case has been Talley's historical waste disposal practices at the WBO facility and TTU during and after the Northbrook policy periods. Given Talley's failure to preserve contemporaneous written records, the most reliable source of evidence with regard to site operations in the 1970s, 1980s and 1990s has been the deposition testimony of a few current and former employees who worked at the WBO and/or TTU during those decades. At least one former WBO operator, Clyde Bao, is now deceased.  (SSOF ¶¶ 78-80.)  Unfortunately, several key players who could have supplied critical missing information are no longer available as witnesses. Allstate's investigation has been particularly prejudiced by the loss of two crucial fact witnesses: Donovan Jones and Charles ("Chuck") Lorenz.

(1)     Donovan Jones

Mr. Jones was employed by Talley from 1967 until 2002, serving as Chief Safety Officer and later Director of Safety and Environmental Quality. (SSOF ¶ 35, 81-83.) He was the author or primary recipient of numerous key documents in this case, and he was directly involved in the earliest known investigations of the environmental issues at the Site. (*Id.*) In the late 1980, Mr. Jones was given responsibility for supervising the waste disposal operations at the WBO and TTU areas. (*Id.*) He was considered by Talley management to be the "hands-on" person with respect to the ADEQ enforcement action, and reported directly to the company's president. (*Id.* ¶ 36.) Along with former CEO Steven Wegener, he was directly involved in setting the $1 million reserve for environmental costs in 1993. (*Id.* ¶¶ 38-39.) Allstate, however, did not learn of Mr. Jones' identity as a potential witness until June 22, 2012, when Plaintiff served interrogatory responses identifying Mr. Jones as an individual involved in environmental issues at the Site. (*Id.* ¶ 84.) Unfortunately, by this time Mr. Jones had passed away. (*Id.*.)

(2)     Charles Lorenz

Mr. Lorenz was employed for 25 years as the risk manager for Talley Industries, Inc. and that capacity was responsible for insurance procurement and claims for the parent corporation and its subsidiaries. (SSOF ¶¶ 85-93). Following the Carpenter Industries acquisition in 1999 (see discussion, *infra*), Mr. Lorenz worked as an independent insurance consultant for Talley Defense Systems and other former subsidiaries. (*Id.* ¶ 85.) He represented Talley Industries in the negotiation and purchase of the Northbrook Policies in the mid-1970s. (*Id.* ¶ 86.) Mr. Lorenz was responsible for the tender to Talley's primary insurers in 2006, and, was also responsible for the decision not to include Allstate in that notice, according to Mr. Mirza:

> Q.  Was there some reason why in August of 2006 that you didn't put Allstate on notice of a claim?
>
> **A.  I relied on Chuck. . . . I'm serious. He's the expert. I didn't know the policies well enough to know who should or shouldn't be put on the claim. . . .**

(SSOF ¶¶ 87-91.) Mr. Lorenz was the author of the July 2006 and October 2008 tender letters and was the Talley point person for all subsequent communications with the insurers regarding the environmental claims. (*Id.* ¶ 47, 89-93.) Former CFO Mirza relied on Mr. Lorenz to handle claim notices and follow-up communications with Plaintiff's insurers. (*Id.* ¶ 88.) Mr. Lorenz was also responsible for maintaining original insurance policies that apply to this litigation, but unfortunately, without Mr. Lorenz, Plaintiff has been unable to locate many of these policies. (*Id.* ¶¶ 75-77.)

In addition, Plaintiff identified Mr. Lorenz as the percipient witness who could support Plaintiff's allegation that Allstate and the other insurer-defendants made allegedly false and/or misleading statements during the negotiation of the insurance policies that induced Plaintiff to purchase the policies – an allegation that Allstate unequivocally denies. (*See* SSOF ¶¶ 96-97.) According to Plaintiff, this allegation was based on a discussion that purportedly took place between Mr. Lorenz and insurance company agents. Aside from this hearsay account of an undocumented conversation that allegedly took place almost 40 years ago, Plaintiff has no evidence to support this "misrepresentation" claim. (*Id.* ¶ 97.)

Unfortunately, Allstate cannot question Mr. Lorenz about the delayed notice to Allstate, or about the facts relating to the negotiation of the Northbrook Policies. According to Plaintiff, Mr. Lorenz now suffers from dementia, and resides in an adult-care facility. (SSOF ¶ 95.) Sadly and ironically, the insured's 17-year delay has rendered unavailable *the only witness who knows the reason for the delay*.

The loss of these witnesses has caused Allstate irreversible prejudice. *See E. Prods. Corp. v. Cont'l Cas. Co.,* 787 N.E.2d 1089, 1095 (2003) (finding prejudice as a matter of law where individual likely to have most knowledge of possible causes of contamination at site died six months after insured's duty to provide notice "as soon as practicable" had arisen); *Rohm & Haas Co. v. Cont'l Cas. Co.,* 781 A.2d 1172, 1181 (Pa. 2001) (prejudice analysis included consideration that employees involved in operation and cleanup of contaminated site were deceased and that those who had

survived to trial likely experienced diminution of recollection of events).

> c.     During the 17-Year Delay, Plaintiff Made Significant Physical Alterations to the Site.

Over the past two decades, operational changes and site remediation activities have significantly altered the WBO and TTU areas where waste disposal activities previously took place. In fact, only eight months before placing Allstate on notice, Plaintiff removed the earthen berms around the TTU pits, removed the concrete structure in Pit #1, and transported approximately 582 tons of soil and concrete to a landfill for disposal. (SSOF ¶ 98.) In addition, "all remaining burn equipment at the TTU including steel apparatus, pans, and structures were removed and decontaminated [] and sold to a scrap metal dealer for recycling." (*Id.*)

The former WBO facility near Plant 3 ceased operations in approximately October 1990. (SSOF  ¶ 99.) In the late 1990s or early 2000s, Plaintiff converted the WBO building into a structure for mixing "gel" chemicals. (*Id.* ¶ 101.) From approximately 1997 to 2000, surface soil was removed from the former WBO pits as the facility underwent closure. (*Id.* ¶ 100.) The site was re-graded and the former pits were filled. (*See id.*)

Plaintiff's alteration of Site and its removal and disposal of physical evidence prior to placing Allstate on notice deprived Allstate and its experts of the opportunity to conduct a meaningful Site investigation and observe the physical evidence firsthand. This conduct alone constitutes substantial prejudice. *See, e.g., West Bay Exploration Co.*, 915 F.2d at 1037-38 (affirming summary judgment for insurer where insured failed to notify insurers before disposing of drip barrels from which contaminants escaped); *Port Servs. Co.*, 838 F. Supp. at 1404 (prejudice to insurer was "clear" where insured did not provide notice until after most of contaminated soil was removed and all tanks, piping, and structures that were probable source of contamination were hauled away); *Olin Corp*, 771 F. Supp. at 79 (granting insurer's motion for summary judgment in case where insured changed physical appearance of site prior to notifying insurer of claim);

*Union Pac. R.R.*, 771 N.W.2d at 620-621 (finding prejudice based in part on destruction of physical evidence that may have been beneficial or crucial to insurer, including excavation of treatment ponds, removal of contaminated soil, and planting vegetation over prior location of contaminated ponds).

### D.   Plaintiff Cannot Meet its Initial Burden of Proving That it is an Insured Under the Northbrook Policies.

The 1975-1978 Northbrook Policies were issued to *Talley Industries, Inc.* as the named insured. (SSOF ¶¶ 1-3.) Plaintiff *Nammo Talley, Inc.* is not identified anywhere in the policies as an insured entity. (*Id.* ¶ 22.) Although Nammo Talley, Inc. seeks to hold Allstate liable for potentially millions of dollars in environmental cleanup costs, it has not provided Allstate with proof that has it has any contractual rights or standing to pursue a claim under the Northbrook Polices.

Plaintiff claims rights under the Northbrook Policies as the current incarnation of "*Talley Industries of Arizona, Inc.*," which was listed as an "additional insured" under Policy 63-002-569.[7] According to Plaintiff, it now owns whatever rights that Talley Industries of Arizona, Inc. might have once held under the policies. The evidence Plaintiff has produced regarding the relevant corporate history, however, does not support this claim.

The named insured, Talley Industries, Inc. was formed in 1960, and began rocket motor manufacturing operations at the Mesa site around that time. (SSOF ¶ 12.) In 1975, after Policy 63-300-019 was issued, Talley Industries formed Talley Industries of Arizona, Inc., to acquire and operate the Mesa facility as a subsidiary of Talley Industries, Inc. (*Id.* ¶ 13.) Subsequently, in 1984, Talley Industries of Arizona, Inc. changed its name to *Talley Defense Systems, Inc.* ("TDS"). (*Id.* ¶ 14.)

In 1998, twenty years after the Northbrook policies expired, Talley Industries, Inc., including all of its subsidiaries, was sold to *Carpenter Technology Corporation*

---

[7] Policy 63-300-019 (1975-1977) identifies the Named Insured as "Talley Industries, Inc. and any subsidiary or affiliated company as now or hereafter constituted subject to notice to the company." (SSOF ¶ 2.)

("Carpenter"), a manufacturer of specialty steel. (SSOF ¶ 15.) Plaintiff contends that the Carpenter acquisition was structured as a stock purchase of Talley Industries, Inc.; however, Plaintiff has never produced any evidence of that transaction to confirm this contention. (*Id.* ¶16.) Carpenter soon divested itself of most of the former Talley Industries subsidiaries, including TDS, while it retained companies involved in the fabrication of stainless steel and other specialty metals, Carpenter's core business. Specifically, in June 1999 Carpenter sold TDS to a group of the company's employees through an employee stock ownership plan ("ESOP"). (*Id.* ¶ 17.) In March 2007, TDS was acquired by *Nammo AS*, a Norwegian corporation. (*Id.* ¶ 20.) In March 2008, TDS changed its name to *Nammo Talley, Inc.* (*Id.* ¶ 21.) Based on available information, the history of these transactions can be summarized as follows:

1960 – *Talley Industries, Inc.* is formed and begins operations in Mesa, Arizona.

1975 – Northbrook Policy 63-300-109 issued.

1975 – *Talley Industries of Arizona, Inc.* is formed and acquires Talley Industries' Mesa operations.

1977 – Northbrook Policy 63-002-569 issued.

1984 – Talley Industries of Arizona, Inc. is renamed *Talley Defense Systems*.

1998 – *Carpenter Technology Corporation* purchases Talley Industries, Inc. and puts Talley Defense Systems and other subsidiaries up for sale.

1999 – Employees purchase Talley Defense Systems through formation of an ESOP. Talley Defense Systems becomes a privately held, 100% employee-owned company.

2007 – Talley Defense Systems is acquired by a Norwegian corporation, *Nammo AS*.

2008 – Talley Defense Systems is renamed *Nammo Talley, Inc.*

The evidence does not support Plaintiff Nammo Talley, Inc.'s claim to be an insured or additional insured under the Northbrook Policies. Plaintiff has not produced proof that Nammo Talley, Inc., is the successor of or the same corporation as Talley Industries of Arizona, Inc., or any other insured. It therefore cannot show that it actually has any rights under the Northbrook policies. First, **Plaintiff has not produced the 1998**

**sale agreement between Talley Industries, Inc. and Carpenter.** (SSOF ¶ 16.) Without this missing document, Plaintiff cannot establish how Talley or its subsidiaries were transferred to Carpenter, and therefore cannot establish whether the Talley corporations retained their corporate existence or were merged into Carpenter (or their assets were purchased by Carpenter). Second, Section 2.18 the 1999 sale agreement between Carpenter and the ESOP refers to a "*Schedule 2.18*" – a list of all insurance policies maintained by Carpenter - under which TDS was to retain certain rights "as a loss payee or otherwise." (*Id.* ¶ 18.)  This provision itself suggests that TDS is *not* the insured under those policies, but Carpenter claimed to be. Although the agreement itself was produced from Nammo Talley's archives, **Schedule 2.18 is missing**, and Plaintiff has offered no explanation for its disappearance. (*Id.* ¶¶ 18-19.) Thus, Plaintiff cannot establish that Carpenter acquired the Talley corporate entities intact as part of the 1998 acquisition, and cannot establish that the Northbrook Policies were among the set of policies listed in Schedule 2.18 under which Carpenter purportedly retained policies but assigned rights to TDS as part of the 1999 sale to the ESOP.

> *This failure of proof is not trivial or hyper-technical.* Talley Industries of Arizona, Inc. was merely one of *forty-one* (41) Talley affiliates and subsidiaries listed as additional insureds in the 1977-78 Northbrook Policies. (SSOF ¶ 4.) Any one of those 41 entities currently in existence or any bona-fide successor entity could still attempt to make a claim under the Northbrook Policies, as Plaintiff has done. If that were to happen, Allstate would have exposure if the aggregate policy limit were reduced or depleted through prior payment to a party having no legitimate rights to coverage, at the expense of an insured entity. Accordingly, Allstate cannot make payments to Nammo Talley unless it is an insured.

> Generally, the insured bears the burden to establish coverage under an insuring clause. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (App. 2000). Courts have held under very similar facts that a claimant's failure to produce schedules identifying the policies transferred, and its failure to prove that the insurer consented to a

transfer of policies, barred coverage due to the claimant's failure to make a sufficient showing that it was an insured. *See, e.g.*, *Water Applications and Sys. Corp. v. Bituminous Cas. Corp.,* 986 N.E.2d 124, 2013 (Ill. App. 2013) (applying Maryland law) (asset sale agreement that referred to insurance policies, but failed to attach or identify policies, did not evidence intent to transfer insurance policies to purchaser; moreover non-assignment provisions were enforceable and precluded coverage for purchaser in any event); *Rexnord Corp. v. American Employers Ins. Co.,* 2012 Ill. App. 2d 11025-U (unpublished) (Dec. 26, 2012) (finding no evidence of intent to transfer rights under insurance policies where acquired company spun off various subsidiaries pursuant to agreement which identified assigned insurance policies in schedule that was missing from agreement.)

Finally, even if Plaintiff could produce evidence that the rights under the Northbrook policies were transferred to TDS as part of the 1999 ESOP sale, coverage would be barred by the "No Assignment" clause in the Northbrook policies. Policy Condition XIV states: "***Assignment of interest under this policy shall not bind the Company unless and until its consent is endorsed hereon.***" (SSOF ¶ 7.) The Northbrook Policies do not contain an endorsement consenting to name TDS as an insured. (*Id.* ¶ 23.) Plaintiff admits it never sought Northbrook's consent to any assignment or transfer of policy rights (*id.* ¶ 24), and concedes that Allstate was not given notice of any ownership changes until it received Plaintiff's notice of the claim in October 2008. (*See id.*). Thus, even if Carpenter had assigned rights under the Northbrook Policies to TDS, the assignment would not have been valid.[8]

---

[8] Provisions requiring insurer consent to any assignment of interest under a policy are enforceable and prohibit the insured from unilaterally adding insureds to a liability policy.  *See Henkel Corp. v. Hartford Accident & Indem. Co.*, 29 Cal. 4th 934, 945 (2003); *Travelers Cas. & Sur. Co. v. United States Filter Corp.*, 895 N.E.2d 1172, 1180 (Ind. 2008); *Keller Foundations, Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 875 (5th Cir. 2010); *Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 530, 539 (W.D. Mich. 2003).

1    In short, Plaintiff cannot establish that Nammo Talley, Inc. is an "insured" under

2    the 1975-1978 Northbrook Policies. Because Plaintiff cannot produce evidence to

3    support this essential element of its claim, Allstate is entitled to summary judgment. *See*

4    *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

5    **III.    CONCLUSION**

6    For the foregoing reasons, Allstate respectfully requests that the Court grant

7    Allstate's motion for summary judgment, and provide such other and further relief as the

8    Court deems just and proper.

9                                              Respectfully submitted,

10   Dated: May 23, 2014                       TROUTMAN SANDERS LLP

11

12                                             By: *s/Timothy P. Irving*

13                                             Louise M. McCabe (pro hac vice)
                                               Timothy P. Irving (pro hac vice)
14

15                                             Attorneys for Defendant
                                               Allstate Insurance Company, solely as successor-
16                                             in-interest to Northbrook Excess & Surplus
                                               Insurance Company, formerly known as
17                                             Northbrook Insurance Company

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN SANDERS LLP
11682 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2092

1
2

**CERTIFICATE OF SERVICE**

3          I hereby certify that on May 23, 2014 I electronically transmitted the foregoing

4   document to the U.S. District Court Clerk's Office by using the CM/ECF System for

5   filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

6

7   Dated:  May 23, 2014                    TROUTMAN SANDERS LLP

8                                           By:  *s/Timothy P. Irving*

9                                           Louise M. McCabe (*pro hac vice*)
                                            Timothy P. Irving (*pro hac vice*)
10                                          Louis M. Segreti (*pro hac vice*)
                                            Troutman Sanders LLP
11                                          11682 El Camino Real, Suite 400
                                            San Diego, California  92130-2092
12                                          Telephone:    (858) 509-6000
                                            Facsimile:    (858) 509-6040
13                                          Email: louise.mccabe@troutmansanders.com

14                                          Law Offices of Robert S. Murphy, LLC
                                            1650 North First Avenue
15                                          Phoenix, Arizona  85003
                                            Telephone:    (602) 528-4728
16                                          Facsimile:    (866) 224-2188
                                            Email:        bob@rmurphylaw.com
17
18                                          Attorneys for Defendant
                                            Allstate Insurance Company, solely as successor-
19                                          in-interest to Northbrook Excess & Surplus
                                            Insurance Company, formerly known as
20                                          Northbrook Insurance Company

21
22
23
24
25
26
27
28