WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nammo Talley Inc., | No. CV-11-01007-PHX-SMM |
| Plaintiff, | **ORDER** |
| v. | |
| Allstate Ins. Co., et al., | |
| Defendants. | |

Before the Court are six motions for summary judgment. Both Plaintiff Nammo Talley, Inc. ("Talley") and Defendant Allstate Insurance Company, solely as successor-in-interest to Northbrook Excess and Surplus Insurance Company, formerly known as Northbrook Insurance Company, ("Allstate") filed motions for summary judgment regarding the pollution exclusion (Docs. 131; 194), various notice and property damage issues (Docs. 190; 193), and allocation (Docs. 165; 167). All motions are fully briefed. The Court will grant Allstate's motion regarding the pollution exclusion, deny Talley's corresponding cross motion, grant the parties' requests for oral argument regarding the remaining motions regarding notice and property damage issues, and hold the remaining motions for summary judgment in abeyance.

**FACTS**

Talley[1] is a defense contractor that has manufactured rocket motors, rocket propellant, and weapons at its manufacturing facility in Mesa, Arizona, ("the Site") since

---

[1] The following facts are undisputed, unless indicated otherwise.

the early 1960's. (Doc. 1 at 15.) Allstate, as a successor-in-interest, issued two successive umbrella policies ("the Policies") to Talley between 1975 and 1978. Policy 63-300-019 was issued for the period January 1, 1975, to January 1978; it was canceled effective January 1, 1977. (Doc. 131-4 at 88.) Policy 63-002-569 was in effect from January 1, 1977, to January 1, 1978. (Id. at 108.) Both policies contain virtually identical qualified pollution exclusions reading, in relevant part:

> This policy shall not apply:
> to personal Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is **sudden and accidental**.

(Doc. 131-4 at 98, 113-114)(emphasis added).

On October 1, 1990, the State of Arizona filed a civil complaint against Talley alleging "groundwater, surface water, and soil contamination" at the Site and neighboring properties. (Doc. 1 at 17.) The State's claims arose out of Talley's historic manufacturing operations at two areas at the Site: the water bore-out area ("WBO") and the thermal treatment unit ("TTU"). (Doc. 1 at 24.).

The WBO operation, active from the 1960's until 1990, involved using a high-pressure water system to remove solid propellant containing ammonium perchlorate from rocket motors.(Docs 1 at 27; 131-1 at 12.) Talley attempted to collect removed propellant through primary and secondary pollutant recovery techniques and then discharged the water used in the operation to unlined evaporative ponds. (Doc. 1 at 28.) At some point, perchlorate leached from the ponds into the local aquifer and resulted in perchlorate contamination of neighboring wells and property offsite. (Doc. 1 at 17, 29.)

At the TTU, active from 1966 to 2006, Talley conducted open burning of waste propellant containing perchlorate along with other materials in unlined burn pits. (Doc. 1 at 30.) During the majority of the TTU's operation, Talley employees dumped the waste

on bare ground. (Doc. 1 at 33-34.) The dumped waste would then be ignited and allowed to burn. (Docs. 131-1 at 32; 134 at 32.) Though these activities were performed pursuant to state permits, the TTU operations contaminated surrounding sites and water.

On August 30, 1991, Talley entered into a consent judgment to settle all claims brought by the State. (Doc. 193-5 at 29.) As part of the judgment, Talley admitted that it violated Arizona Administrative Code § § R18-8-260, et seq., promulgated pursuant to the Hazardous Waste Management Act, A.R.S. §§ 49-901 et seq. (Id at 28-29). Talley agreed to pay a $500,000 civil penalty and to investigate and remediate toxic contamination at the TTU and WBO. (Id. at 35-45.)

Talley initiated the present action after a number of its insurance providers refused to cover the costs associated with Talley's investigation and remediation responsibilities. (Doc. 1.) All other insurers have reached settlement with Talley; Allstate, the lone excess insurer included in the suit, is the last remaining defendant.

**STANDARD OF REVIEW**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate

1 against a party who "fails to make a showing sufficient to establish the existence of an
2 element essential to that party's case, and on which that party will bear the burden of
3 proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th
4 Cir. 1994). The moving party need not disprove matters on which the opponent has the
5 burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary
6 judgment need not produce evidence "in a form that would be admissible at trial in order
7 to avoid summary judgment." Id. at 324. However, the nonmovant "may not rest upon
8 the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific
9 facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita
10 Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v.
11 Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

## DISCUSSION

Allstate seeks summary judgment on Count I (declaratory judgment) and Count II (breach of contract) on the basis that coverage for Plaintiff's claims is barred by the pollution exclusion contained in Allstate Policy Nos. 63-300-109 and 63-002-569. (Doc. 131.) Nammo refutes this claim, and has filed a cross motion for partial summary judgment seeking a determination that the pollution exclusion does not bar coverage. (Doc. 194.) The Court will address the parties' motions in turn.

**a. Allstate's Motion for Summary Judgment**

Allstate claims that the Policies' pollution exclusion bars coverage because Talley does not identify any specific instance of a "sudden" discharge, as interpreted by Smith v. Hughes Aircraft Co., 22 F.3d 1432 (1993). (Doc. 131 at 11-12.) Allstate also argues that, even if the Court interpreted "sudden" as having no temporal meaning, the exclusion would still bar coverage because Talley's polluting activities were intentional. (Doc. 131 at 12-16.) In response, Talley argues that "discharge," as used in the qualified pollution exclusion context, is the migration of toxic pollutants into the environment and that the discharge at issue was not "sudden" because Talley did not expect or intend toxic

- 4 -

migration. (Doc. 196 at 13-20.) Talley also argues that Hughes misapplied Arizona law, and that the Court should find that the "sudden and accidental" clause does not have a temporal element because the pollution exclusion's drafting history allegedly proves the clause was adopted as a mere "clarification" of the "occurrence" definition. (Doc. 196 at 4-11.)

As a threshold matter, the Court agrees with Allstate and finds that Talley has not identified any "sudden," as interpreted by Hughes, discharge that resulted in contamination. Hughes holds that under Arizona law "the definition of 'sudden' incorporates a notion of temporal brevity…." Hughes, 22 F.3d at 1437. Talley makes no factual assertion that contamination resulted from anything but its routine waste-disposal practices that spanned over multiple decades. (Docs. 195 at 10-13, 22-25; 134 at ¶¶ 4, 26, 38). Indeed, Talley's only argument is that Talley did not "expect or intend" contamination over that time. (Doc. 196 at 13-20.) Further, it is undisputed that both the waste disposal and the toxic migration were products of Talley's routine, continuous practices. (Id.) Therefore, Talley has failed to offer sufficient evidence to satisfy the pollution exclusion, as interpreted by Hughes.

Clearly, then, Hughes's precedential value is the keystone issue to this action. In Hughes, the Ninth Circuit held that the "sudden and accidental" pollution exclusion barred coverage for groundwater contamination caused by the insured's long-term practice of discharging waste solvents into unlined ponds.[2] The Circuit confirmed that "the definition of 'sudden' incorporates a notion of temporal brevity and does not merely mean expected…." Hughes, 22 F.3d at 1437. In reaching its holding, the Ninth Circuit found that, pursuant to State Farm Mut. Auto. Ins. Co. v. Wilson, 162 Ariz. 251, 782 P.2d 727 (1989), the district court had properly

> (1) looked to the language of the exclusion and concluded that "sudden" "unmistakably connotes a temporal quality" (otherwise, it would simply be a synonym for "accidental"); (2) concluded that requiring temporal brevity furthered

---

[2] The pollution exclusion in Hughes is materially similar to the pollution exclusion at issue here. See Hughes, 783 F.Supp. 1222, 1230 (1991).

    public policy by excluding deliberate indifference on the part of a polluting insured; and (3) analyzed the purpose of the transaction and, noting that Hughes is not an unsophisticated consumer, concluded that "an interpretation of 'sudden' that fails to recognize its temporal quality" would frustrate the parties' intent by forcing the Insurers to buy into the risk of insuring a pollution prone operation. Id.

  The Circuit also acknowledged the argument that the pollution exclusion was drafted as a "clarification" of the "occurrence" definition. Id. However, the Circuit held that the "drafting and marketing history of the pollution exclusion is not only unclear but also irrelevant because [the insured] has not shown that it relied on this history or that the history played a part in the policy negotiations." Id.

  Arizona having never addressed the interpretation of "sudden and accidental" prior to—or in the 22 years since—the Ninth Circuit's decision, Hughes reflects this Circuit's attempt to predict how Arizona courts would interpret the term in cases involving the qualified pollution exclusion. See Aetna Cas. & Sur. Co. v. Sheft, 989 F.2d 1105, 1108 (9th Cir. 1993) ("When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case.") Accordingly, Hughes remains binding in the Ninth Circuit "in the absence of any subsequent indication from the [Arizona] courts that [the] interpretation was incorrect." Owen v. United States, 713 F.2d 1461, 1464 (9th Cir.1983). Simply said, "[s]tare decisis requires that [this Court] follow [the Circuit's] earlier determination as to the law of a state in the absence of any subsequent change in the state law." Newell v. Harold Shaffer Leasing Co., 489 F.2d 103, 107 (5th Cir. 1974) (cited by Owen, 713 F.2d at 1464).

  Allstate argues that Hughes remains binding on this Court because no Arizona court has suggested that the decision is incorrect. (Doc. 131 at 11.) Talley argues that the court should disregard Hughes because two subsequent Arizona cases—Taylor v. State Farm Mut. Auto. Ins. Co., 175 Ariz. 148, 854 P.2d 1134 (1993) and Ohio Cas. Ins. Co. v. Henderson, 189 Ariz. 184, 939 P.2d 1337 (1997)—indicate that Hughes does not reflect Arizona law regarding the interpretation of insurance contracts. (Docs. 195 at 15; 196 at 5-6, 8). The Court agrees with Allstate.

The Court finds that neither case referenced by Talley gives "indication" or represents a "change in state law" suggesting that Hughes should be vacated. When it comes to using extrinsic evidence to determine a party's intent, a Court may use its sound discretion to consider or deny extrinsic evidence. In Taylor, the Arizona Supreme Court clarified that it is improper for a judge to use his or her own understanding to determine whether a contractual term is ambiguous. Taylor, 175 Ariz. 154, 854 P.2d 1140. The Taylor court emphasized that, where appropriate, a judge should consider parol evidence to define contractual terms because a "court's proper and primary function" is to enforce the meaning intended by the contracting parties. Id. Hughes clearly complies with Taylor's ultimate purpose. In Hughes, the Ninth Circuit determined whether the "sudden and accidental" clause was ambiguous by looking to how different jurisdictions interpreted the language—not by using parol evidence, as suggested by Taylor. Hughes 22 F.3d at 1437. However, the Ninth Circuit nonetheless found the term to be ambiguous and then considered parol evidence to determine the parties' intent. Id. Importantly, Hughes analyzed the meaning of "sudden and accidental" using the factors adopted in *Wilson*—the very framework that Talley suggests the court use here. (Compare Doc.196 at 8 with Hughes, 22 F.3d at 1437). Thus, despite Talley's arguments to the contrary, the Ninth Circuit's finding that the drafting history was unpersuasive on the issue of the contracting parties' intent confirms that the holding was ultimately proper. See Taylor at 175 Ariz. at 153, 854 P.2d at 1139 ("At what point a judge stops listening to testimony that white is black and that a dollar is fifty cents is a matter for *sound judicial discretion and common sense*.")(emphasis added). Therefore, as Hughes did not blindly reject the term's drafting history but found it immaterial to the parties' intent, Taylor does not indicate that Hughes is incorrect.[3]

Talley's argument concerning Henderson is equally unconvincing. Talley argues

---

[3] Talley also argues that, because Taylor was decided just five days before Hughes was argued and submitted for decision to the Ninth Circuit, that the Circuit did not consider Taylor in its decision. (Doc. 194 at 16.) This argument is unconvincing as the Ninth Circuit's written opinion was offered more than five months after Taylor was decided.

- 7 -

that <u>Hughes</u> should be disregarded because <u>Henderson</u> "rests on just the kind of evidence <u>Hughes</u> improperly rejected"—i.e. a term's drafting history. (Doc. 194 at 16.) However, the cases are distinguishable. In <u>Henderson</u>, the court invoked the reasonable expectations doctrine in route to considering the drafting history because the policy was purchased by "average" consumers not expected to read or understand or negotiate their contract. <u>Henderson</u>, 189 Ariz. at 190, 939 P.2d at 1343. In <u>Hughes</u>, the district court and Ninth Circuit denied use of the reasonable expectations doctrine because the contract at issue was not a contract of adhesion. <u>Hughes</u>, 783 F.Supp. at 1229 ("Because [The insured] is a sophisticated buyer of insurance, it defies common sense to call this a contract of adhesion."); Id at 1231 ("Again, it is not lost on the Court that Hughes is not an unsophisticated buyer of insurance."); Hughes, 22 F.3d at 1437 ("We agree with and adopt the district court's analysis…."). The Court is therefore unconvinced that an opinion analyzing a different type of insurance policy, bought by a different kind of consumer, and analyzed under an unavailable legal doctrine calls <u>Hughes</u> into question.

In sum, <u>Taylor</u> and <u>Henderson</u> clarify—not materially alter—Arizona's approach to contract interpretation. Neither decision changes the outcome of <u>Hughes</u>. This Court is therefore bound to follow Circuit precedent and interpret "sudden and material" as having a temporal meaning. [4] As Talley has offered neither fact nor legal argument suggesting that its injuries were the result of a "sudden" event, the Court will grant summary judgment in Allstate's favor.

**b. Talley's Motion for Partial Summary Judgment**

Despite having decided to grant summary judgment in Allstate's favor, the Court will address Talley's cross motion on the pollution exclusion.

Talley argues that the doctrine of regulatory estoppel provides alternative grounds

---

[4] The Court's decision to follow <u>Hughes</u> makes Allstate's additional argument superfluous. Allstate bases its argument and Talley bases its response on the hypothetical situation in which the Court would not attribute a temporal meaning to "sudden." (See Docs. 131 at 12-16; 196 at 13-20.) The Court, therefore, having indeed attributed a temporal meaning to "sudden," will not address Allstate's secondary argument in the interest of judicial efficiency.

on which Allstate should be prevented from invoking the pollution exclusion.[5] (Doc. 194 at 7-14.) Per Talley's argument, regulatory estoppel, a doctrine foreign courts have used to preclude insurers from taking a position contrary to one allegedly presented to a regulatory agency, see e.g. Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of Am., 134 N.J. 1 (1993), is an iteration of estoppel and therefore should be recognized in Arizona because "[e]stoppel gives effect to the reasonable expectations doctrine entrenched in Arizona law." (Doc. 194 at 11.) In response, Allstate argues that the regulatory estoppel claim must fail because Talley does not prove that the parties relied on the drafting history in their negotiations. (Doc. 136 at 11-17.) Further, Allstate argues that the use of Arizona's reasonable expectations doctrine is unfounded. (Doc. 136 at 16-19.) In its Reply, Talley clarifies that the application of regulatory estoppel "hinges" on the reasonable expectations of the state regulators, not the parties. (Doc. 137 at 10.) Having reviewed the parties' positions at length, the Court agrees with Allstate.

The Court is mindful that Arizona has never adopted the doctrine of regulatory estoppel. In fact, Talley concedes that Arizona has "not…addressed regulatory estoppel in this context" (Doc. 194 at 11) before setting forth its regulatory estoppel argument. As discussed previously, this Court is bound to Circuit precedent in the absence of an "indication" or "subsequent change in state law" suggesting that the decision is incorrect. Owen, 713 F.2d at 1464; Newell, 489 F.2d at 107. In Morton, the New Jersey Supreme Court defined the "critical issue" before it as "whether [New Jersey] should give effect to the literal meaning of an exclusionary clause…." Morton, 134 N.J. at 72. The Ninth Circuit clearly addressed this issue in Hughes by interpreting "sudden and accidental" as having a temporal meaning. Hughes, 22 F.3d at 1437. The Court is therefore unconvinced that it should depart from Circuit precedent by way of a foreign legal doctrine employed exclusively by foreign courts.

---

[5] Talley also argues that "the 'sudden and accidental' clause must be interpreted as lacking a temporal element as a matter of law."(Doc. 194 at 14-21.) The Court has already decided against this proposition and will therefore focus its analysis on the unique arguments set forth in Talley's motion for partial summary judgment.

- 9 -

1     Moreover, the Court is unconvinced that Arizona courts would adopt the regulatory estoppel doctrine. The problem lies with Talley's reliance on the doctrine of reasonable expectations. Arizona courts invoke the reasonable expectation doctrine when determining the intent of an insured to interpret terms of an adhesion contract. Darner, 140 Ariz. at 391, 682 P.2d at 396 (adopting RESTATEMENT (SECOND) CONTRACTS, § 211 (1981)). "An adhesion contract is typically a standardized form offered to consumers of goods and services on essentially a 'take it or leave it' basis…." Broemmer v. Abortion Servs. of Phoenix, Ltd., 173 Ariz. 148, 150, 840 P.2d 1013, 1015 (1992). "The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." Id. Accordingly, Arizona Court's would not use the doctrine of reasonable expectations to determine either the regulators' or the parties' intent in this case.

The court does not find that the Arizona insurance regulators either were insureds or lacked "realistic choices" in negotiating the content to the pollution exclusion. Indeed, state regulators presumably held the ultimate power of negotiation. Therefore, Arizona courts would not use the reasonable expectations doctrine to determine the regulators' intent. See Darner, 140 Ariz. at 391.

Further, just as Hughes rejected the insured's invocation of the reasonable expectations doctrine because the insured was a "sophisticated buyer of insurance" that employed its own insurance department and professional insurance brokers, see Smith v. Hughes Aircraft Co. Corp., 783 F. Supp. 1222, 1231 (D. Ariz. 1991) aff'd in part, rev'd in part sub nom. Smith v. Hughes Aircraft Co., 22 F.3d 1432 (9th Cir. 1993), the Court finds that application of the reasonable expectations doctrine is untenable when applied to Talley. At the time of the Northbrook policies, Talley was a self-described "diversified, multi-industry corporation with domestic and international operations serving worldwide markets." (Docs. 136-8 at 7; 136-7 at 6.) Talley had both retail and wholesale brokers negotiating its insurance contracts. (See Doc. 136-6 at 3-4) (Letter from Talley's insurance broker to Northbrook: "Please advise if Northbrook Insurance Company is not

able to comply with any of these points. We are delivering the policy to Talley Industries: however, anticipate their objections in the areas indicated.") Also, Talley's Director of Insurance, Charles Lorenz, an "expert" on insurance matters, handled insurance procurement for Talley and all of its subsidiaries. (Doc. 136-9 at 4, 7-10.) The Court therefore will not apply the reasonable expectations doctrine to determine Talley's intent.

In the end, regardless of which entity's intent—Arizona's regulatory insurance agency or Talley—the Court sets out to determine, use of Arizona's reasonable expectation doctrine would be improper. As the application of Talley's regulatory estoppel argument "hinges" on the reasonable expectations doctrine, the Court will therefore deny Talley's argument as a matter of law.

## CONCLUSION

For the reasons set forth above the Court will grant Allstate's motion for summary judgment and deny Talley's motion for partial summary judgment regarding the pollution exclusion. Accordingly,

**IT IS HEREBY ORDERED** granting Allstate's Motion for Summary Judgment on the Pollution Exclusion (Doc. 131). The Court therefore denies Count II (Breach of Contract) with prejudice. (Doc. 1 at 11-12.) No final determination as to Count I (Declaratory Judgment) will be given until the Court addresses the distinct issues presented in the parties additional motions for summary judgment. (Doc. 1 at 10-11.)

**IT IS FURTHER ORDERED** denying Talley's Motion for Partial Summary Judgment (Doc. 194).

**IT IS FURTHER ORDERED** granting the parties' request for oral argument on the issues contained in Talley's Motion for Partial Summary Judgment Regarding Property Damage (Doc. 190) and Allstate's Motion for Summary Judgment on Late Notice and Named Insured Issues (Doc. 193). The Court will hear oral argument on **Wednesday, April 22, 2015, at 2:00 p.m**. in Courtroom 401, 401 West Washington St., Phoenix, Arizona.  Both Plaintiff and Defendant will be allotted 30 minutes to present their arguments regarding Allstate's motion (Doc. 193). Plaintiff and Defendant will

thereafter be granted 20 minutes to present their arguments regarding Talley's motion (Doc. 190). (The difference in allotted time attributed to the overlapping issues and arguments in the parties' motions.)

**IT IS FURTHER ORDERED** that the Court shall hold the parties' remaining motions for partial summary judgment regarding allocation (Docs. 165; 167) in abeyance.

DATED this 31st day of March, 2015

Honorable Stephen M. McNamee
Senior United States District Judge